**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JUDITH SCHEER | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | NO.  09-209 |
| | : | |
| MOTOROLA, INC. | : | |
| | : | |
| Defendant. | : | |

DuBOIS, J.                                                                                         May 10, 2010

### M E M O R A N D U M

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.  BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.  Judith Scheer's Relationship with Michael Welty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.  The January 2007 Complaint and Motorola's Response. . . . . . . . . . . . . . . . . . . . . . . . 5
    C.  The March 2007 Complaint and Motorola's Response. . . . . . . . . . . . . . . . . . . . . . . . . 7
    E.  Scheer's Suit Against Motorola. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
III.  LEGAL STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
IV.  DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    A.  The Hostile Work Environment Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        1.  Severe or Pervasive Harassment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
            a.  Nature of the Complained of Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
                (i)  Motorola's March 2007 Investigation. . . . . . . . . . . . . . . . . . . . . . . . . 15
                (ii)  Nature of Welty's Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
            b.  Factors Related to Severe or Pervasive Harassment. . . . . . . . . . . . . . . . . . 19
                (i)  Frequency of Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
                (ii)  Severity of Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
                (iii)  Physical Intimidation or Threats. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
                (iv)  Unreasonable Interference with Plaintiff's Job. . . . . . . . . . . . . . . . 22
            c.  Evidence of Severe or Pervasive Harassment Viewed as a Whole. . . . . . . 23
    B.  The Retaliation Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        1.  Evidence related to Scheer's Retaliation Claim. . . . . . . . . . . . . . . . . . . . . . . . . . 25
        2.  Adverse Employment Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        3. Causal Link. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
V. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## I. INTRODUCTION

This is an employment discrimination case in which plaintiff, Judith Scheer, asserts that defendant, Motorola, Inc., violated federal and state law by subjecting her to a hostile work environment and by retaliating against her for complaining about her harasser. Presently before the Court is defendant's Motion for Summary Judgment. For the reasons stated below, the motion is granted.

## II. BACKGROUND

The following facts are undisputed unless otherwise noted and are presented in the light most favorable to the plaintiff.

Scheer began working in July 2000 as an administrative assistant in the Horsham, Pennsylvania branch office of Motorola. (Plaintiff's Response to Defendant's Statement of Material Facts and Plaintiff's Statement of Additional Facts That Preclude Summary Judgment in Favor of Defendant ¶¶ 10, 124; Defendant's Statement of Material Facts as to Which There is No Issue ¶ 10.) (hereinafter, "Def.'s Stmt." and "Pl.'s Stmt.") From July 2000 until 2005, she reported to the Director of Engineering Technology, Don Conrad, Sr. (Pl.'s Stmt. ¶ 11; Def.'s Stmt. ¶ 11.) In either March or April of 2005, she began reporting to Livia McCleary, the Director of Engineering Services. (Pl.'s Stmt. ¶ 11; Def.'s Stmt. ¶ 11.) And in August 2006, Scheer began reporting to Joe DiBiase, Manager of Compliance Engineering. (Pl.'s Stmt. ¶¶ 12, 128; Def.'s Stmt. ¶ 12.) The claims in this case arose during the time Scheer worked closely with her alleged harasser, Michael Welty, while in the DiBiase group.

### A. Judith Scheer's Relationship with Michael Welty

Scheer first met Welty, an engineer in DiBiase's group, when she began working at Motorola in July 2000, but only started working closely with him upon her transfer in August 2006. (Pl.'s

Stmt. ¶ 31; Def.'s Stmt. ¶31.)

Initially, Scheer and Welty had a friendly relationship with one another. (Pl.'s Stmt. ¶ 33; Def.'s ¶ 33.) Welty gave Scheer the nickname "Misty" and asked Scheer to call him by the nickname "Parker." In an August e-mail discussing nicknames, Scheer used the nickname "Sophia" but, after Welty responded by saying "I'm going to miss Misty," Scheer told Welty that "Misty can stay. . . sophia was just a fad. . . ." (Pl.'s Stmt. ¶ 34; Def.'s Stmt. ¶ 34.) Thereafter, Scheer and Welty often used their nicknames when e-mailing one another. (Pl.'s Stmt. ¶ 34; Def.'s Stmt. ¶ 34.) Between August 2006 and January 2007, Scheer and Welty exchanged friendly e-mails in which they discussed personal matters and coordinated their gym schedules. (Pl.'s Stmt. ¶ 41; Def.'s Stmt. ¶ 41; Def's Ex. M-31.)

Scheer and Welty shared a common interest in jokes about Italian stereotypes and e-mailed them to one another. For example, on August 25, 2006, Scheer sent Welty a picture of her cousin because he looked like an "Italian" New Yorker. (Pl.'s Stmt. ¶ 91; Def.'s Stmt. ¶ 91; Def.'s Ex. M-22.)

Scheer and Welty also exchanged e-mails discussing genealogy, one of Scheer's hobbies. In an e-mail dated July 27, 2006, Scheer suggested that Welty could research his mother's family history as a nice surprise. (Pl.'s Stmt. ¶ 36; Def.'s Stmt. ¶ 35; Def.'s Ex. M-5.) Later, in August 2006, Scheer asked for Welty's help reviewing her father's military records. (Pl.'s Stmt. ¶ 38; Def.'s Stmt. ¶ 38.) Scheer spent one to three hours per week during the workday helping Welty with genealogy. (Pl.'s Stmt. ¶¶ 37, 39; Def.'s Stmt. ¶ 39.)

In October 2006, Welty gave Scheer an early birthday gift: a framed photograph of Scheer's father and his World War II squadron. Welty had found the photograph on the internet. (Pl.'s Stmt. ¶ 57; Def.'s Stmt. ¶ 57.) Scheer thanked him for the gift. (Pl.'s Stmt. ¶ 57; Def.'s Stmt. ¶ 57.)

That same month, Scheer returned from a vacation to Italy with gifts for her co-workers, including alcohol and lava rocks for Welty. (Pl.'s Stmt. ¶ 35; Def.'s Stmt. ¶ 35.)

Friendly e-mail exchanges continued into the holiday season. On November 20, 2006, Scheer worked from home to care for her two sick children. In an e-mail chain created on that same date, Scheer and Welty discussed Welty's planned vacation and Scheer's upcoming trip to New York City. Near the end of the chain, Welty wrote "if you feel like gabbing, give me a call. This place is deadsville." Scheer responded, "[w]here'd you go???? I called to yak. . . . Call me if you get the chance," and gave Welty her home phone number. (Pl.'s Stmt. ¶ 42; Def.'s Stmt. ¶ 42; Def.'s Ex. M-27.) In December, Scheer saved a seat for Welty and two other co-workers at the holiday luncheon. (Pl.'s Stmt. ¶ 44; Def.'s Stmt. ¶ 44.) After the luncheon, Scheer, Welty and other co-workers went shopping for gifts. (Pl.'s Stmt. ¶ 44; Def.'s Stmt. ¶ 44.) Scheer had surgery later that month. After the surgery, Welty sent flowers and a card with a handwritten poem to Scheer at her home for her birthday. (Pl.'s Stmt. ¶¶ 58,59, 143; Def.'s Stmt. ¶¶ 58,59.)

Scheer testified that her friendly relationship with Welty began to deteriorate in October 2006. By then, she felt "uneasy" around Welty. (Pl.'s Stmt. ¶¶ 33, 40, 141; Pl.'s Ex. 5; Def.'s Stmt. ¶ 40.) Specifically, Scheer later complained that Welty gave her unwanted attention, spent too much time at her desk, told other co-workers she was not doing her job correctly, tried to get others in the department to take sides in disputes between the two of them, volunteered her for work she did not want to do, asked her what was wrong when she was quiet, got angry when she wouldn't go to the gym with him, became angry and agitated when she tried to get him to back off, and made her believe that he had significant influence over DiBiase. (Pl.'s Stmt. ¶¶ 52, 53, 54, 56; Def.'s Stmt. ¶¶ 52, 53, 54, 56; Deposition of Judith Scheer, 36, 51, 70, 74-75, 89-90, 97-98, 106-07, 116-17, 124, 136, 141-42 (hereinafter "Scheer Dep.); Pl.'s Exs. 5, 22). Welty once asked Scheer to dinner. When

Scheer declined, Welty responded by saying it was "fine." (Scheer Dep. 55). Asked at her deposition why she continued to send friendly e-mails to Welty in November and December, Scheer explained that she wanted to keep everything "low key" and was afraid of Welty because of his frequent claims of influence over DiBiase. (Scheer Dep. 143; Pl.'s Exs. 5, 22.) By the end of December, the situation with Welty "started to get really bad." Scheer was "extremely uncomfortable" around Welty and more nervous than ever before. (Pl.'s Stmt. ¶¶ 33, 40, 145; Def.'s Stmt. ¶ 40.)

### B. The January 2007 Complaint and Motorola's Response

In January, 2007, Welty made two comments to Scheer that caused her to report their deteriorating relationship to Human Resources. First, Welty told Scheer that he left his dirty underwear on the floor and that his cats rolled around in the dirty underwear to get his scent. Scheer informed Welty that this was too much information. Welty did not respond verbally, but instead just smiled. (Pl.'s Stmt. ¶ 49, 146; Def.'s Stmt. ¶ 49.)[1] Welty also told Scheer that his niece "likes when he sits . . . and watches her go to the bathroom." (Pl.'s Stmt. ¶ 51, 147; Def.'s Stmt. ¶ 51.)

Welty's January 2007comments pushed Scheer to report Welty's conduct. On January 22, 2007, she contacted her old supervisor, Don Conrad, and told him about Welty's comments and other behavior that made her uncomfortable. (Pl.'s Stmt. ¶¶ 51, 60, 149-153); Pl.'s Ex. 5; Def.'s Stmt. ¶¶ 51, 60.) Conrad then contacted Dina Toal, the Human Resources representative for his group. (Pl.'s Stmt. ¶¶ 61, 153; Def.'s Stmt. ¶ 61.) Toal met with Scheer and referred her to Harriet Solomon, the Human Resources representative filling in for Bonnie Sick, the Employee Relations

---

[1] Welty testified that he made this comment in the context of a conversation with Scheer regarding disgusting things their animals did. Scheer told Welty that her dog ate "caca" and then tried to lick her and that her dog stuck his nose in her crotch. (Pl.'s Stmt. ¶ 50; Def.'s Stmt. ¶ 50.)

Manager assigned to McCleary's group. (Pl.'s Stmt. ¶¶ 61, 154, 155; Def.'s Stmt. ¶ 61.) Scheer explained to Toal everything that had happened between her and Welty between August and January, including the comments about his cat and niece. (Pl.'s Stmt. ¶ 61, 157; Def.'s Stmt. ¶ 61.) This meeting lasted approximately ten minutes. (Pl.'s Stmt. ¶ 61; Def.'s Stmt. ¶ 61.)

Scheer met with Solomon on January 23, 2007. (Pl.'s Stmt. ¶ 62; Def.'s Stmt. ¶ 62.) At the meeting, Scheer told Solomon she thought that Welty was a "really nice guy" but then explained the events of October through January that made her uncomfortable. (Pl.'s Stmt. ¶ 63; Def.'s Stmt. ¶ 63.) Scheer also explained that, while she was concerned about Welty's behavior, she did not want direct involvement from Human Resources because she didn't trust DiBiase and thought he might retaliate. (Pl.'s Stmt. ¶ 158; Scheer Dep. 160-61.) Instead, she wanted to just "stay low" until she could transfer back to Conrad's group. (Scheer Dep. 160-61.) Solomon agreed to let Scheer handle the situation on her own. She gave Scheer advice on how to explain to Welty that their relationship had become too personal for comfort. (Pl.'S Stmt. ¶ 159; Scheer Dep. 160-61.) Solomon also told Scheer to follow up and explained that if Scheer's efforts with Welty failed, Human Resources would have to get involved. (Scheer Dep. 161.) Solomon also told Scheer that Human Resources "would not tolerate retaliation." (Scheer Dep. 161.) Scheer was happy with the outcome of her meeting with Solomon. (Scheer Dep. 161.)

On January 26, 2007, Scheer sent Welty an e-mail asking him to stop using the nickname "Misty" and to instead refer to her as "Judy." The e-mail also explained that "we need to keep this on a more professional level." (Pl.'s Stmt. ¶¶ 67, 164; ; Def.'s Stmt. ¶ 67; Def.'s Ex. M-12.) Welty responded "if this is your wish, I will honor it. I care for you and I will always do everything I can to help you succeed. I'm sorry this is the way it has to be." (Def.'s Ex. M-12.)

Despite the talk with Solomon and the January 26 e-mail exchange, Scheer continued to feel

uncomfortable around Welty because he frequently asked her what was wrong.  (Pl.'s Stmt. ¶¶ 69, 165; Def.'s Stmt. ¶ 69.)  At one point after Scheer's talk with Solomon, Welty came to Scheer's desk, said that they were both acting like children and said "I'm going to fix it."  (Pl.'s Stmt. ¶ 69; Def.'s Stmt. ¶ 69.)  When Solomon later contacted Scheer to ask how the situation with Welty was being handled, Scheer told Solomon that things were okay.  (Scheer Dep. 169-70.)

### C.  The March 2007 Complaint and Motorola's Response

On Friday, March 2, 2007, Scheer had a conversation with a co-worker, Donna Fitzgerald, in which the Fitzgerald reported that Welty had told her and DiBiase that Scheer was not doing her job.  After the phone call, Scheer walked to Welty's desk, confronted him about the allegation that she wasn't doing her job, and told Welty to stop.  Then she turned around and walked away as Welty said "don't leave.  Talk to me."  Scheer began walking faster.  Welty followed her.  Feeling nervous, Scheer told Welty once again to leave her alone and then ran into the women's bathroom to hide. (Pl.'s Stmt. ¶ 166; Scheer Dep. 130-32.)

Scheer reported the incident to Bonnie Sick in the Human Resources department on Monday, March 5. (Pl.'s Stmt. ¶ 173.)  The two met that day in Sick's office.  There, Scheer recounted Welty's aggressive behavior the previous Friday and the complaints she had made to Solomon in January. (Pl.'s Stmt. ¶ 71; Def.'s Stmt. ¶ 71.)  Scheer also provided e-mails and a detailed time line chronicling Welty's behavior.  (Def.'s Ex. M-10.)  Scheer found one e-mail, sent by Welty on January 18, 2007 with the subject line "gabagoul,"[2] to be particularly threatening.  The e-mail states, in part

> I'm dying to hear the continuing saga of you shame my family, I pray for you.  Would you sent the emails to me at home.  I'd love to read them, very entertaining.  This could turn in

---

[2] "Gabagoul" or "gabagool" is a slang term for capicola or coppa, a pork Italian cold cut popularized in the HBO television series *The Sopranos*.

the Sopranos. Have some gabagoul. Then I'm gonna blow your freaking brains out. Tony wouldn't have a chance against your sharp tongue. You're right, it's the ones that go to church you got to watch out for.

. . .

Don't work too hard today and don't kill our boss. It could be worse.

Flowers and sunshine, and rainbows, and sugar, and spice, and hugs, and kisses, Parker

(Pl.'s Ex. 10.)[3]

Motorola promptly launched a formal investigation into Welty's conduct. (Pl.'s Stmt. ¶ 74; Def.'s Stmt. ¶ 74.) Because Sick believed that the gabagoul e-mail could be interpreted as a threat, she determined that a "Situational Assessment Team" (SAT")[4] should be assembled to coordinate the investigation. (Pl.'s Stmt. ¶ 74; Def.'s Stmt. ¶ 74.) In addition, Sick called Scheer the night of March 5 and told her to work from home for a few days . (Pl.'s Stmt. ¶ 74; Def.'s Stmt. ¶ 74.) The SAT team met on March 6 to discuss the situation. It then recommended that Scheer continue to work from home, advised that she stay at another location for safety reasons, discussed safety tips with her, delivered a cell phone to her home in case she needed to immediately contact Motorola's security team and advised her of the help that could be provided by local authorities, including obtaining a restraining order. SAT also performed a background check on Welty. (Pl.'s Stmt. ¶¶ 81, 175-185; Def.'s Stmt. ¶ 81.) Welty was placed on administrative leave on March 7. (Pl.'s Stmt. ¶ 84; Def.'s Stmt. ¶ 84.) Scheer returned to work on March 8. (Pl.'s Ex. 16; Def.'s Ex. L-54.) The

---

[3] Scheer testified in her deposition that she also showed this e-mail to Conrad and Toal when she complained about Welty in January. (Scheer Dep. 158.) She did not show it to Solomon or Sick in January.

[4] A SAT is an interdisciplinary team staffed by employees from Motorola's Security, Employee Assistance, Human Resources, and Legal departments. In appropriate cases, the SAT could become a CORE SAT team, comprised of senior-level officers from each of the previously mentioned departments. (Pl.'s Stmt. ¶ 74; Def.'s Stmt. ¶ 74.)

absence caused her to miss a training session for which she had previously enrolled. (Pl.'s Stmt. ¶ 187.)

During its investigation, Motorola discovered an e-mail Scheer had sent to Welty on January 17, 2007, one day before the January 18 "gabagoul" e-mail Welty had sent to Scheer. The January 17 e-mail concerned Scheer's cousin, Gene Wassmer, who owed money to a man named Giovanni for a debt incurred after a vacation to Italy. In the e-mail, Scheer asked Welty for advice about the tone of an e-mail she was sending to her cousin. (Pl.'s Stmt. ¶ 89; Def.'s Stmt. ¶ 89; Def.'s Ex. L-39.)[5]

Motorola closed its investigation on March 19, 2007. (Pl.'s Stmt. ¶ 93; Pl.'s Ex. 16; Def.'s Stmt. ¶ 93; Def.'s Ex. L-54.) It concluded that Welty had violated Motorola's Safe and Respectful Workplace and Sexual Harassment policies. (Pl.'s Stmt. ¶¶ 93, 190; Pl.'s Ex. 16; Def.'s Stmt. ¶ 93; Def.'s Ex. L-54.) A formal written warning was placed in Welty's permanent record. In addition, Welty was made ineligible for merit pay increases or promotions for one year, instructed to attend anti-sexual harassment training and told to confine his interactions with Scheer to business-related matters. (Pl.'s Stmt. ¶ 94; Pl.'s Ex. 16; Def.'s Stmt. ¶ 94; Def.'s Ex. L-54.) Several of Welty's calibration responsibilities, including calibration paperwork and database maintenance, were removed. Thereafter, Welty trained Greg Horton on calibration. When Scheer had a question related to calibration, she would ask Horton, who would then ask Welty. (Pl.'s Stmt. ¶ 95; Def.'s Stmt. ¶ 95.) Welty was also moved to a separate building. When Scheer was required to enter Welty's building, Scheer would ask DiBiase to arrange their schedules so that the two would not come into contact with one another. DiBiase complied with these requests. (Pl.'s Stmt. ¶¶ 96, 97; Def.'s Stmt.

_____

[5] The parties dispute whether the January 17 e-mail was related to the January 18 "gabagoul" e-mail. (Pl.'s Stmt. ¶ 89; Def.'s Stmt. ¶ 89.) However, they do not dispute the contents or timing of the two e-mails.

¶¶ 96, 97.)

Scheer received a voice-mail from Sick on March 20, 2007, after returning from sick leave. The voice-mail informed Scheer that Welty was being transferred to a new location. (Scheer Dep. 226.) Scheer also met with Sick on March 23. At that meeting, Sick asked Scheer why she hadn't reported Welty's conduct earlier and why she reported it to Conrad in the first instance rather than DiBiase. (Scheer Dep. 226.) Sick also told Scheer that Welty was being moved, that Scheer should limit her interactions with him and that Welty would be counseled. (Scheer Dep. 228.) Aside from Sick's statement at the March 23 meeting, Scheer was never informed of the results of her complaint. In particular, she was never told that the potential threat to her safety had been neutralized. (Pl's Stmt. ¶¶ 192, 202.) Because she was never explicitly told that the threat to her safety had been resolved, Scheer was in a state of constant anxiety at work. (Pl.'s Stmt. ¶ 193.) Afraid that Welty would be present at some department meetings or "town hall" meetings, Scheer did not attend them. (Scheer Dep. 285-87.) Scheer did not express these concerns to DiBiase or Sick. (Scheer Dep. 286.)

Scheer's March 5, 2007 complaint was the last time she complained of discrimination or harassment to a manager or Human Resources representative at Motorola. (Scheer Dep. 229-230.)

Welty appealed Motorola's finding that he violated its Safe and Respectful Workplace and Sexual Harassment policies. The appeal was denied. (Pl.'s Stmt. ¶ 104; Def.'s Stmt. ¶ 104.)

Scheer testified that her co-workers treated her differently after her March complaint. Several co-workers with whom she had previously had friendly discussions stopped talking to her about non-work-related matters. (Pl.'s Stmt. ¶ 108, 109; Def.'s Stmt. ¶ 108, 109.) DiBiase became even colder and more distant than usual. (Scheer Dep. 302.) Horton, who was friendly with Welty, withheld information from Scheer regarding her calibration responsibilities and stopped friendly non- work-related interaction with Scheer. (Scheer Dep. 281.) Scheer reported this to DiBiase, who

relayed the concerns to Horton and told him to work professionally with Scheer. (Pl.'s Stmt. ¶ 110; Def.'s Stmt. ¶ 110.) Neither DiBiase nor Scheer reported Horton's conduct to Human Resources. (Pl.'s Stmt. ¶ 110; Def.'s Stmt. ¶ 110.) Scheer never complained to Human Resources about DiBiase. (Scheer Dep. 78.) None of Scheer's coworkers brought up her complaint against Welty. (Scheer Dep. 274-85.)

Scheer was informed in May 2009 that her position was being eliminated as part of a department-wide reduction in force. (Pl.'s Stmt. ¶ 24; Def.'s Stmt. ¶ 24.) She was formally terminated on May 13, 2009. (Pl.'s Stmt. ¶ 207.)

### E. Scheer's Suit Against Motorola

Scheer cross-filed complaints with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Rights Commission (PHRC) on July 17, 2007. (Pl. Ex. 17.) She filed her Complaint with this Court on January 15, 2009.

The Complaint contains two counts. Count One alleges a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Specifically, the Complaint alleges that Scheer was exposed to a hostile work environment and that she was retaliated against for complaining about Welty. Count II alleges a violation of the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.*, based on the same claims. This Court has jurisdiction over Scheer's Title VII claim pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the related PHRA claim pursuant to 28 U.S.C. § 1367.

## III. LEGAL STANDARD

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).

The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). After examining the evidence of record, a court should grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "Where the record taken as a whole could not lead a reasonable trier to fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

## IV. DISCUSSION

Under Title VII of the Civil Rights Act, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Accord Huston v. Proctor & Gamble Paper Prods., 568 F.3d 100, 104 (3d Cir. 2009).

Plaintiff alleges two violations of Title VII and the PHRA. First, she alleges that sexual harassment created a hostile work environment.[6] Id. Second, she alleges retaliation for engaging

---

[6] "Employer liability under the Pennsylvania Human Relations Act follows the standards set out for employer liability under Title VII." Knabe v. Boury Corp., 114 F.3d 407, 410 (3d Cir. 1997) (citing Hoy v. Angelone, 691 A.2d 476 (Pa. Super. Ct. 1997).

in protected employment activity.[7]  Andreoli v. Gates, 482 F.3d 641, 650 (3d Cir. 2007).  The Court

addresses each of these arguments in turn.

## A.  The Hostile Work Environment Claim

In order to establish a hostile work environment, Scheer must establish a genuine issue of

material fact regarding the five essential elements of the claim: (1) the employee suffered intentional

discrimination because of her sex; (2) the discrimination was severe or pervasive,[8] (3) the

discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect

a reasonable person of the same sex in that position; (5) the employer is liable under the doctrine of

respondeat superior.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993);  Huston, 568 F.3d at 104.

 The Court concludes that no reasonable jury could return a verdict for the plaintiff based on the

evidence presented in the record related to her hostile work environment theory.  Specifically, the

evidence fails to show a genuine issue of material fact as to whether the discrimination was severe

or pervasive.  Because there is no genuine issue of material fact as to this element, the Court need

not consider the other elements of Scheer's hostile work environment claim.

### 1.  Severe or Pervasive Harassment

In order to establish a hostile work environment, Scheer must prove that harassment at

Motorola was so "severe or pervasive as to alter the conditions of [her] employment and create an

abusive work environment."  Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).

---

[7] Retaliation claims based on either the PHRA or Title VII are to be interpreted
identically.  Slagle v. County of Clarion, 435 F.3d 262, 265 n.5 (3d Cir. 2006).

[8] The Third Circuit's recent opinion in Huston uses the words "pervasive and regular,"
568 F.3d at 104, but the Supreme Court uses the terms "severe or pervasive," see Clark Country
Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001).  The Supreme Court's formulation of the
standard controls.  See Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006)(Alito, J.)
abrogated on other grounds,  Burlington N. v. Sante Fe Ry. Co. v. White, 548 U.S. 53 (2006).

Defendant argues that Scheer's allegations of harassment do not cross this threshold. The Court agrees.

Although the first four elements of a hostile work environment claim are conceptually distinct, they blend together in practice. The Supreme Court's articulation of the standard, for instance, combines the second, third, and fourth elements:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Harris, 510 U.S. at 21. In order to determine whether an environment is sufficiently hostile or abusive, the Court must look at all of the circumstances. Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). Title VII is not a "general civility code." Id. Indeed, "conduct must be extreme to amount to a change in the terms and conditions of employment." Id.

The Supreme Court has used four factors to guide courts as they consider the totality of the circumstances: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interferes with an employee's work performance. Id. See also Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001). Mindful of these standards, the Court concludes that the evidentiary record, viewed as a whole, is insufficient to create genuine issues of material fact as to whether Scheer was subjected to severe or pervasive harassment.

### a. Nature of the Complained of Conduct

In order to decide whether Motorola employees created a hostile work environment, the Court must first determine what harassment a reasonable jury could link to a discriminatory animus. See Jensen v. Potter, 435 F.3d 444, 449-50 (3d Cir. 2006) (Alito, J.) *abrogated on other grounds by* Burlington N. v. Sante Fe Ry. Co. v. White, 548 U.S. 53 (2006); Kraus v. Howroyd-Wright Employment Agency, No. 06-975 , 2008 WL 90325, at *12 (E.D. Pa. Jan. 8, 2008).

### (i) Motorola's March 2007 Investigation

Scheer testified that the hostile work environment claim was based on Welty's sexual harassment. (Scheer Dep. 55.) However, Scheer's brief states that her hostile work environment claim is also based, in part, on her assertion that the evidence establishes that Motorola employees investigating Welty's conduct caused Scheer to believe that Welty posed a threat to her and to her family and then never communicated that the threat had been neutralized. As a result, Scheer testified that she felt uneasy, that she was "always looking over her shoulder at work," that she didn't feel safe, and that she felt alienated from the group. (Pl.'s Stmt. ¶¶ 45, 193; Scheer Dep. 383.)

The SAT team Motorola assembled to handle Scheer's March complaint included Barry Lenhart, Motorola's Director of Security. (Pl.'s Stmt. ¶ 82; Def.'s Stmt. ¶ 82.) Shortly after Scheer's complaint, Lenhart asked Scheer several questions, including whether Welty owned a gun, whether he was a pedophile, whether he drank, whether he knew her home address, whether he had ever asked her to have an affair, whether he was in the military, and whether he was married. (Pl.'s Stmt. ¶¶ 79, 82, 183.) In addition, Scheer was told to work from home for safety reasons and was given advice on how to remain safe. (Pl.'s Stmt. ¶¶ 79, 80.) Motorola initially advised her to seek a restraining order against Welty, but then told her not to because doing so might make Welty angry. (Pl.'s Stmt. ¶¶ 79, 83, 181, 182.) Despite these elaborate measures, no one at Motorola ever told

Scheer that the threat posed by Welty was ever neutralized or that she was safe. (Pl.'s Stmt. ¶ 84, 98.)

The above evidence does not demonstrate discrimination or harassment. The evidence shows, rather, that Motorola took Scheer's complaint seriously and invested significant time and resources in making sure that it was resolved quickly and effectively. It makes little sense to treat Motorola's efforts to assist Scheer as evidence of a hostile work environment. Doing so would place employers on a" razor's edge" as they faced liability for either investigating too thoroughly or for not investigating at all. See McDonnell v. Cisneros, 84 F.3d 256, 261 (7th Cir. 1996) (noting the potential of liability under Title VII for failing to investigate and rejecting the argument that an employer's investigation was itself sexual harassment). Moreover, although there is evidence that Motorola's efforts increased Scheer's apprehension, the evidence also shows that (1) Motorola moved Welty to another building, (2) Motorola, through DiBiase, coordinated the schedules of Welty and Scheer to minimize interaction, (3) Scheer did not complain about Welty or any other employee after March 2007, (4) Scheer was aware that Welty was counseled regarding the complaints and (5) Lenhart told Scheer she would be safer at work where Motorola security could look after her safety. (Pl.'s Stmt. ¶¶ 96, 97, 189; Scheer Dep. 226, 228-30, 286.) This evidence is such that no reasonable jury could conclude that Motorola's concern over Scheer's safety in March 2007, and its actions to ensure her safety, were subjectively or objectively harassing or discriminatory.

### (ii) Nature of Welty's Conduct

At least some of the incidents Scheer complains of regarding Welty were not objectively or subjectively harassing or discriminatory. The gifts Scheer received are one example. Scheer testified that she did not think that the photograph of her father, by itself, was harassment. (Scheer Dep. 138.) She thought only that it was "above and beyond" and that he wouldn't have done the

same for a male co-worker. (Scheer Dep. 139.) After a receiving card containing a hand-written poem in December, Scheer wrote "Thanks for your card Parker! Nice of your to send it." (Pl.'s Stmt. ¶ 58; Def.'s Stmt. ¶ 58; Def.'s Ex. M-29.) Later that same day, after Welty sent flowers to Scheer at her home, Scheer e-mailed Welty: "Parker, I just got your flowers. They are beautiful! Thank you SO much! It brightened my day." (Pl.'s Stmt. ¶ 59; Def.'s Stmt. ¶ 59; Def.'s Ex. M-29.) When Welty asked if getting the gifts at home was a problem, Scheer responded that the gifts caused "[n]o grief at all. Very nice gesture." (Def.'s Ex. M-29.) There is no evidence that Scheer found this conduct to be harassing or threatening. In fact, the context shows otherwise. The photograph of Scheer's father was provided after Scheer had discussed her father's military record and talked to Welty about genealogy; the flowers and poem were provided after Scheer's surgery. In this context, no reasonable jury could find that the gifts were part of a pattern of severe or pervasive harassment.

Similarly, no reasonable jury could find that Welty's conduct between August 2006 and early January 2007 was discriminatory or harassing. Scheer complained that Welty spent too much time around her desk, got angry when she wouldn't speak with him or go to the gym with him, asked Scheer to go to lunch and dinner with him, and generally made it clear that he had feelings for her. At least until January, however, the evidence shows that Scheer did not find this conduct to be harassing. She voluntarily agreed to use the friendly nickname "Misty" in her correspondence with Welty, whom she called "Parker." In August, she told Welty "thanks for the pep talks & concern. You're a nice person. We could use more people like you in this place (and the world) . . . . . you should've been a social worker. You may have been poor now, but you would've made a difference in alot [sic] of people's lives . . . ." (Pl.'s Stmt. ¶ 36; Def.'s Stmt. ¶ 35; Def.'s Ex. M-5.) As to the excessive time around her desk, Scheer concedes that she spent one to three hours during the workday each week with Welty doing genealogical research. (Scheer Dep. 55.) In November,

Scheer e-mailed Welty asking to "yak." (Pl.'s Stmt. ¶ 42; Def.'s Stmt. ¶ 42; Def.'s Ex. M-27.) And in December, she saved seats at the holiday luncheon for Welty and other co-workers and then went out with them after work to do holiday shopping. (Pl.'s Stmt. ¶ 44; Def.'s Stmt. ¶ 44.) Even into January, Scheer was coordinating with Welty so that they could go to the gym together (Def.'s Ex. D-31.)

The behavior described above – voluntary, consensual, and friendly interactions – does not constitute discrimination or harassment that is objectively or subjectively pervasive or severe. Maher v. Associated Servs. for the Blind, 929 F. Supp. 809, 813 (E.D. Pa. 1996) ("Title VII does not protect a plaintiff who experiences conduct that is merely offensive or annoying."). Conduct much worse than Welty's has been held to be insufficient to withstand summary judgment where a plaintiff had a mutually flirtatious relationship with the accused harasser. See e.g., Kraus, 2008 WL 90325, at *12 (granting defendant's motion for summary judgment on plaintiff's hostile work environment claim where plaintiff provided evidence that manager discussed contents of sexual dream, made comments about wanting to see plaintiff naked, called plaintiff and told her he wanted to have sex with her in the shower, offered to help her find a permanent position in return for sexual favors and attempted to hug the plaintiff in his office, but where the evidence also showed that the manager and plaintiff engaged in intersexual flirtation with one another); Pittman v. Continental Airlines, Inc., 35 F. Supp. 2d 434, 442 (E.D. Pa. 1999) (concluding that plaintiff who occasionally worked with coworkers who inquired about her personal life and who engaged in extended, sometimes graphic, conversations about relationships did not create a hostile work environment).

Scheer testified that she kept up the friendly interactions with Welty, even though she felt uncomfortable around him as early as October 2006, because he frequently talked about his influence with DiBiase and because she wanted things to be "low key." (Scheer Dep. 143; Pl.'s Exs. 5, 22.)

Even so, none of Welty's messages contained sexual overtures or innuendo. Welty never expressly or impliedly made requests for sexual favors in return for favorable treatment. Welty did ask Scheer to dinner once, but, when she declined, responded that it was "fine" and did not ask a second time. (Scheer Dep. 55.) Although there is evidence that Welty frequently asked Scheer what was the matter, this conduct is not harassing or discriminatory. See Lulis v. Barnhart, 252 F. Supp. 2d 172, 177 (E.D. Pa. 2003) (noting that defendant's inquiries into "how Plaintiff was doing" were void of sexual conduct or suggestion). Viewed as a whole, the evidence shows that Scheer and Welty had a mutually friendly relationship at least through December 2006, but that in January 2007 things "started to get really bad." (Pl.'s Stmt. ¶¶ 33, 40; Def.'s Stmt. ¶ 40.)

### b. Factors Related to Severe or Pervasive Harassment

Although Welty's conduct between August and December 2006 was not harassing or discriminatory, by January 2007 Scheer testified that she felt uneasy and uncomfortable around Welty. Several incidents between January and March heightened these concerns: (1) the "gabagoul" e-mail sent by Welty on January 17, (2) Welty's disgusting comment that his cats liked to rub themselves in his dirty underwear to get his scent (3) Welty's comment that his niece likes it when he watches her go to the bathroom, (4) Welty's pursuit of Scheer down a hallway when she wouldn't respond to his questions, (5) Welty's staring, frequently asking Scheer what was the matter, and his statements to Scheer's co-workers that she wasn't doing her job correctly.

### (i) Frequency of Conduct

Scheer has presented evidence that, over the course of her nearly nine years of employment at Motorola, she was harassed by the actions of one co-worker between August 2006 and March 2007. Even if the relevant period of time in which to measure the frequency or pervasiveness of the harassment to which Scheer was exposed is the shorter, twenty-month period, from August 2006 to

May 2009 in which Scheer worked in DiBiase's group, the conduct of which Scheer complains – two disturbing comments, one disturbing e-mail, and the "frequent" entreaties and manipulations of an emotional and sometimes distraught co-worker – does not amount to pervasive harassment. See e.g., Lulis, 252 F. Supp. 2d at 174-75, 177 (concluding that nine incidents over the course of seventeen months, including following plaintiff and looking at him attentively were not pervasive or regular). Welty's comments regarding his cats and niece are best viewed as offhand, isolated disturbances. Unless "extremely serious," these are not enough. See Faragher 524 U.S. at 788. See also Weston, 251 F.3d at 428 ("The mere utterance of an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently affect the conditions of employment to implicate Title VII liability.") As discussed in more detail below, the "gabagoul" e-mail, while vexing when shorn of its context, is likewise best viewed as an isolated instance, especially given the voluminous e-mail exchanges between Scheer and Welty in the period of August 2006 to January 2007. Finally, although Scheer testified that Welty "frequently" asked her what was the matter after she told him she no longer wanted to be called Misty, she qualified this statement by explaining that his comments occurred "a couple of times per week, and then as time went by, he saw that I wasn't [talking and] wouldn't ask as often." (Scheer Dep. 168.) No reasonable jury could conclude that these instances, over the course of several months, amount to pervasive or regular conduct. See e.g., Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430-32 (7th Cir. 1995) (reversing jury verdict in favor of plaintiff employee subjected to nine incidents of offensive behavior over the course of seven months, including, among other things, calling plaintiff "pretty girl," making the sound "um um um" when plaintiff was wearing a leather skirt, and evoking masturbation with an ostentatious gesture).

### (ii) Severity of Conduct

Although perhaps perplexing and offensive, no reasonable jury could conclude that Welty's

comments regarding his cats and niece were severe. The comment about the cats is disgusting, but it is not explicitly sexual. Welty's comment about his niece is upsetting, but courts have found comments much worse than this to be insufficiently severe. See Bonora v. UGI Utilities, Inc., No. , 2000 WL 1539077, at *4 (E.D. Pa. Oct. 18, 2000) (concluding that employee's conduct, including staring at plaintiff's chest, touching her hand, brushing his buttocks against hers, and touching her waist, was not severe or pervasive); Lulis, 252 F. Supp. 2d at 175-76 (describing defendant's conduct, including making off-color jokes, leering at plaintiff and asking plaintiff "what can you do for me" after plaintiff asked for a "family-friendly" assignment, as insufficiently severe). As described in more detail below, the "gabagoul" e-mail, when viewed in context, was not severe. And, with regard to Welty's pursuit of Scheer down a hallway in March, there is no evidence that Welty made sexual or threatening comments at that time. Although his insistence on talking to Scheer made her uncomfortable, it was not so severe as to change the conditions of her employment. See, e.g., Id. at 175,176 (holding that defendant's conduct was not severe when it included, among other things, following plaintiff around during a conference).

### (iii) Physical Intimidation or Threats

The only evidence of potentially threatening conduct is the "gabagoul" e-mail Welty sent to Scheer on January 18, 2007. Although this e-mail might be viewed in isolation as a threat, there is no evidence that anyone informed of its context actually believed it to be so. Motorola, out of an abundance of caution, assumed the e-mail to be a threat, launched its investigation and took action to protect Scheer's safety, but it did all of this before it was aware of the January 17 e-mail or the numerous jokes Scheer and Welty exchanged regarding Italian stereotypes. (Sick Dep. 113-16); Def. Ex. L-54.) Even assuming that the "gabagoul" e-mail was a threat to Scheer's safety when viewed in the context of Scheer's January 17th e-mail asking for advice about her cousin's debt to an Italian

man named Giovanni, Scheer testified that she was "concerned and afraid" but didn't think "at that point it would go that far." (Scheer Dep. 178). Indeed, although she showed the e-mail to Conrad and Toal when she complained in January, Scheer did not make the effort to show the e-mail to Solomon and did not emphasize the e-mail until she complained again in March. The e-mail is closer to an "offensive utterance" than to a physical threat. Cf. Yandrisevitz v. H.T. Lyons, Inc., No. 08-1444 2009 WL 2195139, at *8 (E.D. Pa. July 22, 2009) (holding that male constructive worker's comments to plaintiff female co-worker that he had a "talking stick" for use in resolving disputes, and that he had "anger issues" and martial arts training was not so extreme as to constitute severe or pervasive harassment when male worker never actually threatened violence or threatened to actually harm plaintiff). Viewed in relation to the entire evidentiary record, no reasonable jury could conclude that the gabagoul e-mail was a threat.

### (iv) Unreasonable Interference with Plaintiff's Job

There is no requirement that Scheer prove physical or emotional harm to succeed on her hostile work environment claim. See Harris, 510 U.S. at 22. It is appropriate, however, to consider whether the alleged conduct unreasonably interfered with plaintiff's job as one factor, among others, used to determine whether a work environment was so hostile as to violate Title VII. Id. at 23. Although Scheer testified that her unease and fear for her safety caused her to avoid meetings in which she though Welty would attend, there is no evidence that this interfered with her ability to perform her job. (Pl.'s Stmt. ¶ 125.) To the contrary, Scheer told Sick that things were "okay" after she complained in January, (Scheer Dep. 169-70) and did not complain about any of her co-workers after March 2007, (Scheer Dep. 130.). Scheer also testified that she didn't want to succeed in DiBiase's group because she wanted to transfer back over to Conrad's group. (Scheer. Dep. 98-99.) Moreover, the parties agree that Scheer's termination was not performance related. (Pl.'s Stmt. ¶

125.) Given this evidence, no reasonable jury could conclude that Welty's conduct unreasonably interfered with Scheer's job performance.

### c. Evidence of Severe or Pervasive Harassment Viewed as a Whole

Finally, even if all of the events taking place between August 2006 and March 2007 described in the evidentiary record are viewed as a whole, no reasonable jury could conclude that they constitute severe or pervasive harassment. Courts have granted defendants' motions for summary judgment with evidence establishing harassment much worse than the conduct described by the parties in this case. See e.g., Adusumilli v. City of Chicago, 164 F.3d 353, 357 (7th Cir. 1998) (holding defendant's conduct insufficiently severe or pervasive where plaintiff's co-worker's stared at her breasts, asked if she wore low-neck tops, and touched her arm, fingers and buttocks); Black v. Zaring Homes, Inc., 104 F.3d 822, 823-24 (6th Cir. 1997) (reversing jury verdict and concluding that evidence showing that defendant told plaintiff, among other things, that "nothing I like more in the morning than sticky buns" while looking plaintiff up and down and smiling; looked at plaintiff and joked that a parcel of land next to a Hooter's Restaurant should be called "Titsville" or "Twin Peaks"; told plaintiff she was "paid great money for a woman"; and asked plaintiff if she was dancing on tables at a biker bar was insufficiently severe or pervasive); Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.3d 333, 334- (7th Cir. 1993) (concluding that defendant's actions, which included, among other things, asking plaintiff about her personal life, telling her how beautiful she was, repeatedly asking her for dates, jokingly called her a "dumb blond," trying to kiss plaintiff at a bar, placing "I love you" signs in plaintiff's work area, trying to put his arms around plaintiff's shoulder six times, and trying to kiss plaintiff twice in the front office, were not severe or pervasive); Saidu-Kamara v. Parkway Corp., 155 F. Supp. 2d 436, 439 -40 (E.D. Pa. 2001) (holding conduct that included touching plaintiff's breasts; telling plaintiff she looked "fresh"; removing a large bottle of

wine from his pants, offering plaintiff a drink and asking her to join him at a local hotel for a "good time"; and patting plaintiff's buttocks and breasts was insufficiently severe or pervasive); Gautney v. Amerigas Propane, Inc., 107 F. Supp. 2d 634, 644 (E.D. Pa. 2000) (holding that evidence showing that plaintiff's co-workers visited strip clubs, that one coworker lowered his pants and showed a group of people a tattoo on his pelvic bone, told plaintiff that men did not like aggressive women, told plaintiff she was using only 1/3 of her assets and should dress in a skirt and heels, discussed how "best to use women to increase sales," that another coworker discussed the size of his sex organs, described his sexual history and showed plaintiff a sexually explicit story he had written was insufficient to demonstrate severe or pervasive conduct.)

Plaintiff focuses the court's attention on several cases in which the courts held that facts were sufficient to show severe or pervasive harassment. These cases are distinguishable. Ascolese v. SEPTA, for instance, held that plaintiff was exposed to a hostile work environment in a situation in which several different co-workers harassed her and where there was a factual dispute as to why SEPTA took several months to investigate and resolve plaintiff's complaints. No. 07-665, 2008 WL 2165102, at *8 (E.D. Pa. 2008 May 22, 2008). Here, Scheer's claim is based primarily on the actions of one employee, Welty, and there is no dispute that Motorola took prompt action to stop Welty's conduct when Scheer asked it to. (Scheer Dep. 49-50.)

Plaintiff also cites Hiltabidel v. Uniontown Newspapers for the proposition that "any determination as to whether discriminatory behavior occurred will require a finder of fact to consider the totality of the circumstances and choose between two opposing renditions." No. 08-409, 2009 WL 3856208, at *3 (W.D. Pa. Nov. 17, 2009). But in this case, the parties agree about the facts regarding Welty's conduct and Motorola's response. They disagree only about the legal significance of those facts – a quintessential question of law appropriate for resolution in a motion for summary

judgment.  See Anderson, 477 U.S. at 252 ("The judge's inquiry . . . unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict."); see also Shira Scheindlin & John Elofson, Judges, Juries and Sexual Harassment, 17 Yale L. & Pol'y Rev. 813, 849 ("The mandate of Celotex, Anderson and Matsushita compels a judge to assess the evidence in the record and make an evaluation as to its sufficiency to support its conclusion.  The judge cannot decline to do this by deferring, instead, to the judgment of the jury.")

In sum, the evidence presented by Scheer as to whether harassment at her workplace was so severe or pervasive as to alter the conditions of her employment does not create a genuine issue of material fact. No reasonable jury, viewing the incidents individually and collectively, could conclude that Welty or other employees at Motorola took action "so objectively offensive as to alter the conditions" of Scheer's employment.  Oncale v. Sundowner Offshore Serv. Inc., 523 U.S. 75, 81 (1998).  Accordingly, the Court grants defendant's motion for summary judgment as it relates to plaintiff's claim that Motorola violated Title VII and the PHRA by subjecting her to a hostile work environment.

### B.  The Retaliation Claim

To overcome Motorola's motion for summary judgment on her retaliation claim, Scheer must provide evidence establishing that there are no genuine issues of material fact as to the three elements of the claim: (1) that she engaged in a protected activity, (2) that Motorola took an adverse employment action against her and (3) that there is a causal link between the adverse action and the protected activity. Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir. 2007).

### 1.  Evidence related to Scheer's Retaliation Claim

As with the facts presented throughout this memorandum, the facts described below are presented in the light most favorable to Scheer and are undisputed unless described otherwise.

In her capacity as an administrative assistant, Scheer answered the phone, helped her groups with scheduling and travel plans and completed routine paperwork. (Pl.'s Stmt. ¶¶ 12, 14; Def.'s Stmt. ¶¶ 12,14.) She was also responsible for entering calibration data for some of Motorola's labs into the Blue Mountain database. (Pl.'s Stmt. ¶ 20; Def.'s Stmt. ¶ 20.) Although Conrad's group had an administrative assistant located in Schaumburg, Illinois, Scheer continued to provide informal, part-time, administrative support to Conrad and others in his group – including Gene Ambrosio, the Information Technologies Director – who were based in Horsham. (Pl.'s Stmt. ¶ 16; Def.'s Stmt. ¶ 16.)

In early 2008, Motorola adopted a plan to reduce costs in the Engineering Services Group by 10%. (Pl.'s Stmt. ¶ 18; Def.'s Stmt. ¶ 18.) At this time, Scheer's position was preliminarily selected for termination. (Pl.'s Stmt. ¶ 19; Def.'s Stmt. ¶ 19.) DiBiase and McCleary finalized their decision to terminate Scheer in April 2009. (Deposition of Livia McCleary, 134) (hereinafter "McCleary Dep.")

DiBiase, McCleary, Conrad and Ambrosio had several discussions about transferring Scheer to Conrad's group. Since 2005, Conrad been trying to obtain approval for an administrative assistant in his group. In fact, Conrad testified that he spoke to McCleary about having Scheer transferred to his group in mid 2006. (Deposition of Donald Conrad 45) (hereinafter "Conrad Dep.") After Scheer complained to Conrad in January 2007 about Welty, Conrad called McCleary several times to ask about the possibility of having Scheer transferred. (Pl.'s Stmt. ¶ 29.) McCleary never followed up on these conversations. (Pl.'s Stmt. ¶ 29.) Conrad testified that he kept trying to have an administrative assistant position opened for his group: "I worked at it pretty hard, but I never got to the point where I could post a job, so a job never was posted. Primarily, every time I though I was close, we'd have a layoff." (Conrad Dep. 47.)

In November, 2008, Scheer's informal working arrangement with Ambrosio was formalized: Conrad's group paid for her time and she began working for Ambrosio two days per week. (Pl.'s Stmt. ¶ 17; Def.'s Stmt. ¶ 17.) A short time thereafter, her calibration responsibilities were transferred to a male employee, Michael Nowak. (Pl.'s Stmt. ¶ 105; Def.'s Stmt. ¶ 105.) Nowak was hired by DiBiase in October 2008 to perform product safety and electromagnetic compatibility testing, to oversee calibration for the Compliance Lab, and to ensure compliance with quality control systems. (Pl.'s Stmt. ¶ 106; Def.'s Stmt. ¶ 106.)

Scheer also alleges that the conduct of her co-workers was retaliatory. She testified in her deposition that several of her co-workers stopped talking to her after she complained about Welty. (Pl.'s Stmt. ¶ 108; Def.'s Stmt. ¶ 108.) DiBiase also became distant, cold and aloof, minimizing his contact with Scheer. (Pl.'s Stmt. ¶ 111; Def.'s Stmt. ¶ 111.) Finally, Scheer's anxiety and the continued fear of interacting with Welty caused her to miss several department meetings and events. (Pl.'s Stmt. ¶ 112; Def.'s Stmt. ¶ 112.)

## 2. Adverse Employment Action

An adverse employment action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. Ry. v. White, 548 U.S. 53, 68 (2006). No reasonable jury could conclude that the evidence presented by Scheer showing that she was afraid to attend meetings and that she felt alienated by her coworkers establishes an adverse employment action. Nor could a reasonable jury conclude that Welty's actions after Scheer complained in January constitute an adverse employment action.

Scheer testified at her deposition she was afraid to attend department meetings and events because she believed Welty might be in attendance. She also testified that Sick told her not to have any interaction with Welty. Scheer believed this meant she couldn't attend meetings if she thought

Welty would be there. (Scheer Dep. 285-86.) But Scheer never asked Sick if this was, in fact, the case. Nor did she ask DiBiase if she should attend the meetings or whether Welty would be in attendance. Evidence that Scheer voluntarily decided to miss department meetings based on nothing more than uncertainty, which she did not attempt to dispel, could not lead a reasonable jury to conclude that an adverse employment action occurred. There is no evidence that Motorola prevented or encouraged Scheer to miss department meetings and events.

Evidence that Scheer was shunned at work is, likewise, insufficient to convince a reasonable jury of an adverse employment action. Title VII is not a "general civility code." Faragher, 524 U.S. at 788. It does not require that Scheer's co-workers "take sides" by supporting Scheer, nor does it require that co-workers be, or remain, friends. Brooks v. City of San Mateo, 229 F.3d 917, 929 (9th Cir. 2000) ("Because an employer cannot force employees to socialize with one another, ostracism suffered at the hands of coworkers cannot constitute an adverse employment action.") Scheer testified that DiBiase was cold and distant after she complained about Welty. But she admitted that DiBiase asked her to communicate more, (Scheer Dep. 302), and testified that DiBiase was cold and distant before she complained, (Pl.'s Stmt. ¶ 111; Def.'s Stmt. ¶ 111.). Moreover, Scheer never complained about DiBiase's demeanor or treatment of her. (Scheer Dep. 78.) The conduct of Scheer's co-workers following her complaint does not constitute an adverse employment action.

Finally, Scheer argues that Welty's actions after her January complaint constitute an adverse employment action. No reasonable jury could come to that conclusions based on the evidence presented. At no point between January and March, 2007, was Scheer moved to another building, paid less, or deprived of work opportunities. In addition, Solomon told Scheer that Human Resources would intervene if the situation with Welty did not improve. (Scheer Dep. 161.)

Solomon also told Scheer that Human Resources would not tolerate retaliation. (Scheer Dep. 161.) Importantly, Scheer told Human Resources she wanted to deal with the problem on her own. (Scheer Dep. 160.) When she couldn't resolve the problem and reported Welty again in March 2007, Human Resources did intervene, ultimately sanctioning Welty and moving him to a separate building. (Pl.'s Stmt. ¶ 96; Def.'s Stmt. ¶ 96.) No reasonable jury could conclude that Scheer's work experience between January and March, 2007, "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

### 3. Causal Link

The evidence does not establish a causal link between an adverse employment action and Scheer's complaints. Aside from the alienation of her co-workers and Welty's actions, Scheer asserts that Motorola's failure to transfer her to another group, the transfer of her responsibilities to Nowak, and her termination are each adverse employment actions. Assuming, without deciding, that this is the case, Scheer's claim still fails because no reasonable jury could find a link between these actions and Scheer's complaints.

Although Scheer's termination and the transfer of her responsibilities to Nowak are closely related, Scheer has presented no evidence that either event occurred because she complained about Welty. First, the evidence shows that the decision to terminate her position occurred, at the earliest, in January 2008. (Pl.'s Stmt. ¶ 18; Def.'s Stmt. ¶ 18.) This is approximately ten months after her March 5, 2007 complaint about Welty – too long to create an inference of retaliation. See Clark County, 532 U.S. at 273-74 ("The cases that accept mere temporal proximity between employer's knowledge of a protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very

close' . . . ."); <u>Andreoli</u>, 482 F.3d at 650 (finding that the "five-month time period between Andreoli's informal complaint . . . and the first alleged adverse action . . . is, without additional evidence, insufficient to raise an inference of causation). Even if the relevant period is the time between the filing of the Complaint on January 15, 2009 and Scheer's termination on May 13, 2009 – approximately four months – there is still no inference of retaliation because the undisputed evidence shows that the decision to terminate Scheer's position occurred before she filed the Complaint. The decision to terminate Scheer's position also occurred before some of her responsibilities were transferred to Nowak. <u>See</u> <u>Clark County</u>, 532 U.S. at 272 ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitely determined, is no evidence whatsoever of causality.").

Second, it is undisputed that Motorola, facing difficult economic conditions, was working diligently to cut costs through layoffs. (McCleary Dep. 130) ("Motorola is under economic pressures and is facing . . . reduced revenues."); (Scheer Dep. 216, 225) (explaining rumors and examples of downsizing at Motorola); (Conrad Dep. 47) (noting that every time he got close to getting a position in his department for Scheer "there was another layoff"). The transfer of some of Scheer's responsibilities to a technician made sense given the decision to terminate her position. Moreover, the transfer of responsibilities occurred in November 2008 – approximately the same time that Scheer had less time to perform those responsibilities because of her work for Ambrosio two days per week.

The only evidence that Motorola transferred her responsibilities to Nowak in November 2008 and terminated her in May 2009 because of her complaint about Welty is Scheer's speculation at her

deposition. This is not enough. No reasonable jury could conclude, based on the evidence presented, that Scheer lost her job, or had her responsibilities transferred, because she complained about harassment from Welty. See Choe-Rively v. Vietnam Veterans of America, 135 F. Supp. 2d 462, 476 (D. Del. 2001) (holding that plaintiff's offer of "nothing more than allegations and unsupported speculation that [defendant] acted with discriminatory animus" was insufficient as a matter of law); cf. Robertson v. Fiore, 62 F.3d 596, 600 (3d Cir. 1995) (noting that plaintiff's claim of discrimination based on political association "must be based on more than speculation," before affirming the district court's grant of defendant's motion for summary judgment).

Finally, there is no evidence that Motorola's decision not to transfer Scheer out of DiBiase's group was a result of her complaint about Welty. The undisputed evidence shows, rather, that Scheer could not be transferred because Motorola was terminating positions across the company and there were no open positions for an administrative assistant. (Conrad Dep. 47; Ambrosio Dep. 29, 34-39.) Plaintiff points to evidence that McCleary told Ambrosio there was a "hold" on Scheer that prevented her transfer. (Ambrosio Dep. 30, 46, 47, 54-55; Scheer Dep. 291-93.) Defendant disputes that a hold ever existed. (Def.'e Ex. H.) Whether there was a "hold" on Scheer is irrelevant unless there was an open position for her to be held from, and there is no evidence of any such opening. Cf. Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1137 (3d Cir. 2004) ("An employer's failure to promote a plaintiff to a non-existent position is not enough to support a presumption of intentional racial discrimination."). As such, the dispute over whether a hold existed is immaterial. Anderson, 477 U.S. at 248 (explaining that a fact is material only when it "might affect the outcome of the suit under the governing law."). Just as fatal to the Scheer's argument that the "hold" was retaliatory is the lack of evidence linking any hold to her complaint about Welty.

Scheer's speculation that Motorola decided to terminate her position ten months after she complained about Welty is insufficient to create a genuine issue of material fact. Her argument that Motorola would not allow her to transfer to a separate group is likewise insufficient. To the contrary, the evidence shows that she was terminated as part of an economically-related reduction in force. No reasonable jury could conclude otherwise.

## V. CONCLUSION

There are no genuine issues of material fact as to whether Scheer was exposed to severe or pervasive harassment – and hence, a hostile work environment – during her nine years of employment at Motorola. The same is true of Scheer's claim that was retaliated against for complaining about Welty. Because there are no genuine issues of material fact, defendant's Motion for Summary Judgment is granted. An appropriate Order follows.